**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KAREN MIRANDA GLEASON<br>c/o 1825 K Street NW, Ste 750<br>Washington, DC 20006 | )<br>)<br>)<br>)<br>) |
| Plaintiff, | )<br>) Civil Action No. |
| v. | )<br>) |
| | ) Jury Trial Demanded |
| DAVID L. BERNHARDT, Secretary,<br>U.S. DEPARTMENT OF THE<br>INTERIOR,<br>1849 C Street NW<br>Washington, DC 20240 | )<br>)<br>)<br>)<br>)<br>) |
| Defendant. | )<br>) |

## COMPLAINT

Karen Miranda Gleason ("Plaintiff"), by and through his undersigned counsel, complains of the Department of the Interior ("Defendant" or "Agency") as follows:

## PARTIES

1. Plaintiff is a resident of Boise, Idaho.

2. On information and belief, David L. Bernhardt, Secretary for the Department of the Interior, is named in his official capacity as the Defendant that formerly employed Plaintiff.

## JURISDICTION AND VENUE

3. This Court has federal question jurisdiction under 28 U.S.C. § 1331 and pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") and Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 *et seq.* ("Rehab Act").

4. Venue is proper in this judicial district because Defendant is located here and discriminatory

1

actions complained of occurred within this Judicial District.

5. Plaintiff has exhausted her administrative remedies by timely filing this lawsuit within 90-days of March 17, 2020, the date Plaintiff received the Office of Federal Operations of the U.S. Equal Employment Opportunity Commission ("EEOC") decision dated March 12, 2020.

## **STATEMENT OF FACTS**

*Background Information.*

6. Plaintiff is female and suffers from manic depression/bi-polar disorder, which is a disability that substantially limits her major life activities of sleep, concentration, with symptoms of extreme fatigue and anxiety.

7. In or around November 1998, Defendant hired Plaintiff as a Public Affairs Specialist, GS-12, Fish and Wildlife Service, at the Regional Office located in Denver, Colorado.

8. Plaintiff's job performance was always exemplary as demonstrated by her promotion to a GS-13 in 1999 and reflected by her impressive federal career spanning for over 32-years without any discipline, counseling, or negative performance reviews.

9. In or around July 2003, Plaintiff relocated to Boise, Idaho where she held the same position (also referred to as Outreach or Communication Coordinator) and she reported directly to the Deputy Branch Chief (first-line supervisor) and the Branch Chief (second-line supervisor).

10. Upon Plaintiff's arrival in 2003, Brian McManus (male, no disability, no prior EEO activity), was Plaintiff's first-line supervisor and Phil Street (male, no disability, no prior EEO activity), was her second-line supervisor until 2006.

11. From approximately mid-2006 through the Fall of 2010, Brian Segar (male, no disability, no prior EEO activity), replaced McManus as Plaintiff's first-line supervisor and McManus became Plaintiff's second-line supervisor.

12. By 2005, Plaintiff had personally disclosed her disability to McManus, Segar, and Roberta D'Amico (Segar's wife) who was the Vice Chair on the National Wildlife Coordinating Group's Wildfire Education and Prevention Working Team ("WFEWT").

*2006 – Discrimination and Harassment.*

13. In 2005, Plaintiff verbally reported her concerns about sexual harassment to Street regarding a male and female on the WFEWT and she also reported concerns about financial activities regarding Segar's wife D'Amico, who was in the National Interagency Fire Center External Affairs ("NIFC EA").

14. Following Plaintiff's complaints, McManus issued Plaintiff a tentative FY2004 Performance Rating of "Minimally Successful" for the category of "Interagency Coordination" which she had never received any unsatisfactory ratings in that category (or any category) prior to her complaints.

15. On November 29, 2005, Plaintiff met with McManus to dispute the proposed rating, where he explained that he lowered her "Interagency Coordination" rating because Plaintiff had complained about sexual harassment and financial activities related to employees in WFEWT and NIFC EA, and thus, McManus concluded that Plaintiff was "not a team player."

16. Plaintiff complained to Street and McManus about her rating which was eventually raised to "Fully Successful" because there was nothing to support McManus's lowered rating, which was issued to Plaintiff in retaliation for her protected activities.

17. On August 30, 2006, McManus issued Plaintiff a Proposed 5-Day Suspension with 22 allegations based on statements from staff on WFEWT and D'Amico, with references made about Plaintiff as "bi-polar" and "stressed" therefore, Plaintiff was "uncooperative, dishonest, threatening, and dangerous to her coworkers."

18. These allegations were false, Plaintiff had never engaged in the alleged misconduct and on December 6, 2006, Defendant's Proposed Suspension was not sustained after Plaintiff successfully refuted the claims against her.

19. Plaintiff filed a grievance against McManus based on the Proposed Suspension claiming its issuance was improper and based issued to retaliate against her which she later resolved with Defendant on August 21, 2007.

20. From approximately the Fall of 2010 to the Fall of 2012, Chris Wilcox, (male, no disability, no prior EEO activity), Fire Operations Program Leader, served as the Acting Deputy Branch Chief and Plaintiff's first-line supervisor.

21. In or around July 2012, Robert Eaton (male, no disability, no prior EEO activity), became Plaintiff's first-line supervisor and Segar remained her second-line supervisor until Wilcox replaced him in October 2015.

22. Jeff Rupert (male, no disability, no prior EEO activity), Division Chief, was Plaintiff's third-level supervisor.

23. During this time frame, Plaintiff repeatedly reported to management (including Refuge Chief Jim Kurth) that she was being subjected to retaliation for her prior complaints.

24. In 2012, Segar disclosed Plaintiff's disability to Eaton and D'Amico told Plaintiff's coworkers that she was "bi-polar" and therefore recommended that "working with groups" was "too stressful" for Plaintiff because of her disability.

*2012 – Plaintiff's Head Injury, Medical Leave, and Requests for Reasonable Accommodations.*

25. On or about January 30, 2012, Plaintiff fell on ice while at work and suffered a concussion.

26. Plaintiff's injury required that she take medical leave from work for treatment and recovery until February 28, 2012.

4

27. On or about February 8, 2012, Plaintiff provided medical documentation to Wilcox that identified Plaintiff's medical condition as post-concussive syndrome, a disability that substantially limited her major life activities of eyesight, reading, and concentration.

28. Upon Plaintiff's return to work, she made several requests for reasonable accommodations (modified work schedule of 4-hours, frequent breaks, medical leave for treatment).

29. In or around March 2012, Plaintiff disclosed her disability (bipolar disorder) to Wilcox during a conversation with him in his office.

30. Plaintiff further explained her disability to Wilcox and how the chemical imbalance impacted her moods causing anxiety and depression.

31. Plaintiff also advised Wilcox that D'Amico had made unfounded accusations against Plaintiff based on her disability and baseless claims that Plaintiff should not be permitted to work with people or in public affairs because she was bi-polar.

32. D'Amico's conclusions about Plaintiff's ability to work in groups or in public affairs was based solely on her discriminatory animus towards Plaintiff's mental disabilities without any legitimate reasons.

33. D'Amico's discriminatory bias towards Plaintiff was shared by her supervisors Wilcox, Segar, and later Eaton becoming more overt after Plaintiff's head injury, medical leave, management's knowledge of her bi-polar disorder, and her requests for reasonable accommodations.

*2012 - Harassment, Removal of Job Duties, Revocation of Work Trip*

34. Following Plaintiff's return to work with post-concussive syndrome, Plaintiff's supervisors discriminated and retaliated against her based on her disability, protected activities, and subjected her to ongoing, continuous, and regular harassment.

35. In March 2012, Plaintiff complained to Wilcox that she was being excluded from the NIFC EA webinar, which she would normally be included on.

36. On April 5, 2012, Wilcox belligerently accused Plaintiff of turning off the overhead lights above her desk without requesting and receiving management's approval, which he alleged Plaintiff had created a "safety hazard" for others in the building.

37. This was untrue because the room was never dark to impair visibility and Plaintiff observed that other employees, who had no disability and no prior EEO activity turned off their overhead lights as they desired, without management approval and without any accusations of creating a "safety hazard."

38. On April 6, 2012, Wilcox met with Plaintiff to discuss her concerns about being excluded from NIFC EA and Sheri Kososik, Employee Relations Specialist, was also present.

39. During this meeting Wilcox removed Plaintiff's job duties and directed Plaintiff to discontinue her work with the NIFC EA group and threatened that Plaintiff was to "cease and desist all contact with NIFC EA" and spoke down to Plaintiff instructing her that she was prohibited from entering the NIFC EA suite.

40. There were no legitimate reasons for the removal and when Plaintiff asked Wilcox for any examples that supported the removal of her duties, he was unable to provide any.

41. Defendant's removal of Plaintiff's ability to work with the NIFC EA group significantly changed her job duties and was based on her disability and retaliation for her protected activities.

42. On April 10, 2012, Wilcox sent Plaintiff a threatening and harassing email that falsely accused her of "continued aggressive and intimidating behavior towards coworkers," that was "unacceptable and must cease," and further alleged that Plaintiff's "behavior" was

"disruptive, negatively affect[ed] the work of others," and Wilcox accused Plaintiff of "bullying and intimidation" that would not be tolerated.

43. Plaintiff had not engaged in any of the alleged conduct in Wilcox's email.

44. On April 20, 2012, Plaintiff submitted medical documentation that cleared her to perform all of her job duties with the exception of wild fires and/or emergency situations.

45. On May 31, 2012, Wilcox abruptly canceled Plaintiff's planned business trip to Merritt Island, Florida which he stated that her business travel was no longer supported due to alleged concerns about her medical condition.

46. This was not feasible since Plaintiff had already submitted medical documentation negating any alleged concerns about her medical condition and there was no risk that she would need to respond to wild fires or emergency situations.

47. Defendant's removal of Plaintiff's job duties, persistent false accusations, threatening disciplinary actions, and cancellation of Plaintiff's trip caused her humiliation, severe anxiety, marginalized her work and contributions, lost job experience and career opportunities, and lowered her professional standing among her peers.

*2013-14 – Harassment, Lost Details, Denied Job Duties, Reassignment/Transfer, Letter of Reprimand.*

48. In 2013, Plaintiff submitted an application to the FWS Advanced Leadership Development Program for GS-13/14 employees, which Plaintiff was eligible for but Eaton rejected her application and told her "You don't have leadership potential."

49. Eaton's discriminatory and retaliatory refusal to consider Plaintiff's request based on his subjective opinion of Plaintiff's "leadership potential" was untrue and unsupported by her demonstrated job performance.

50. In July 2013, Marla Trollan, Chief for FWS Mountain-Prairie Region Chief of External

Affairs invited Plaintiff to work a 4-month detail which was also a temporary promotion to Supervisory Public Affairs Chief, GS-14, and would provide Plaintiff with valuable experience for future promotions.

51. Eaton initially agreed to Plaintiff's detail but then added contingencies: first Eaton requested changes to Plaintiff's salary payments, which Trollan agreed upon; then Eaton required that Plaintiff be available to complete unidentified Branch work, at any time while she was on the detail, which cancelled Plaintiff's detail opportunity.

52. After Eaton changed the requirements to permit Plaintiff to go on this detail several times until the detail opportunity was no longer feasible, he smugly criticized Trollan and stated to Plaintiff, "You'd think a woman at her level would have all her ducks in a row before she invites you on a detail."

53. Eaton's discriminatory remarks about Trollan, specifically identifying her as a "woman" echoed the general perception about women being less capable, easily upset, or less prepared than men.

54. Plaintiff had heard Wilcox made similar snide and dismissive comments about women being referred to as "unstable" or "emotional" and difficult to work with.

55. On August 15, 2013, Plaintiff met with Eaton to request returning her job duties working with NIFC EA, which he denied and explained to Plaintiff that she is unable to work with NIFC EA because "you know how you are," and "you can't get along with groups."

56. Eaton's stated reasons were discriminatory, not true, and when Plaintiff asked Eaton again for an example of how she exhibited this behavior he has repeatedly referenced, he became noticeably irritated, angry, and he refused to answer Plaintiff or provide any examples.

57. Instead, Eaton berated Plaintiff and called her "irrational" and implied that she was "crazy"

for asking him that question.

58. Eaton called Plaintiff "irrational" often even though she had never reacted in an "irrational" manner, further illustrating Eaton's discriminatory animus towards her mental disabilities and her as a female.

59. On September 12, 2013, Plaintiff met with Segar and Eaton to discuss her concerns regarding the August 15, 2013 meeting, Eaton's denial of her request to return her job duties with NIFC EA, and his derogatory and discriminatory comments he continuously made about her mental stability and alleged emotional state.

60. In this meeting, Eaton again made serious allegations against Plaintiff based on her disability and stated that if he allowed Plaintiff to participate with the NIFC EA group, Plaintiff would likely become physically confrontational with her interagency coworkers.

61. Eaton's speculative comments were not based on any evidence, facts, or past behavior but solely based on his stereotypes of mental disabilities and further evidencing his perception of Plaintiff as mentally unstable.

62. Eaton's comments were not only false about Plaintiff, but highly offensive, implied that she could become physically violent, and she asked both Eaton and Segar to immediately cease their ongoing accusations and humiliating comments about her.

63. In September 2013, Eaton issued Plaintiff a Letter of Reprimand for alleged "Failure to Follow Supervisory Instructions" because she had complained to Segar in August 2013 without first requesting permission from Eaton.

64. Plaintiff submitted a Reply to the Letter of Reprimand and complained that she was being subjected to discrimination.

65. After Eaton issued Plaintiff the Letter of Reprimand, he then provided her with specific

instructions about when she was permitted to communicate with her supervisors above him, both when he was in the office and when he was not.

66. Plaintiff was overwhelmed with stress, anxiety, unable to perform her job duties, unable to find any assistance to stop management's ongoing harassment without being disciplined, so she contacted Kurth and requested a transfer because her supervisors were discriminating against her.

67. Kurth advised Plaintiff to file a grievance, which she alleged Eaton subjected her to a hostile work environment and requested relief (transfer) but Segar declined her grievance and on appeal, Rupert also declined Plaintiff's grievance.

68. On July 9, 2014, Plaintiff filed another grievance against Segar for his continued derogatory comments about Plaintiff and ongoing harassment.

*2015 - Assignment to Sho-Pai Building and Denial of Requests for Office in Jack Wilson Building.*

69. In July 2015, Segar directed Wilcox and Eaton to consolidate the outlying Branch offices into the main suite in the Jack Wilson building, which resulted in Plaintiff being placed in an isolated remote corner of the distant Sho-Pai building, physically removed from all other Branch staff except Ballard, the only other employee who also suffered from a disability.

70. On July 27, 2015, Plaintiff told Wilcox that she was concerned about her isolated location and requested to be assigned to one of the three empty offices in the main suite as a reasonable accommodation for her depression because she needed natural light.

71. Wilcox told Plaintiff that her request would "be a lot of trouble" and would make "people unhappy" if others were moved to accommodate Plaintiff.

72. Plaintiff pleaded with Wilcox and explained that isolating her in a different building would negatively impact her ability to perform her job duties, i.e. access to communications as the

Branch Communication Coordinator, which required that she communicate with other
Branch staff.

73. Wilcox refused Plaintiff's requested reasonable accommodation and stated that her only
option for natural light was to remain in the Sho-Pai outlying building.

74. Shortly after December 2015, Plaintiff met with Wilcox and asked him again to be located in
the main suite and explained it would enable her to perform her job.

75. In 2016, Cameron Tongier (male, no disability, no prior EEO activity) who also directly
reported to Eaton, requested an empty office with a window in the main suite which Wilcox
approved.

*2016 – Harassment*

76. In or around May 2016, the Plaintiff attended the funeral of a firefighter and her colleague
who had committed suicide.

77. Kim Van Hemelryck, (no disability, no prior EEO activity) another employee of the DOI,
FWS, National Interagency Fire Center, Fire Management Branch, was also in attendance
and upon her return, Van Hemelryck reported false allegations about Plaintiff to Wilcox
accusing her of inappropriate behavior at the funeral.

78. More specifically, Van Hemelryck claimed that Region 6 team members had told her that
Plaintiff was "bad-mouthing" Van Hemelryck, the Branch, Wilcox, and Eaton at the funeral.

79. This was false and Van Hemelryck testified that she had no personal knowledge of her
allegations because she was not seated near Plaintiff and never communicated with Plaintiff
at the funeral.

80. To the contrary, Becky Brooks, Fire Management Specialist, was seated with Plaintiff during
the dinner prior to the funeral and personally observed her during the funeral which Brooks

described Plaintiff's behavior as never disruptive and Plaintiff never "bad-mouthed" anyone at the Branch, refuting Van Hemelryck's allegations.

81. After the funeral, on or about May 17, 2016, Plaintiff requested changes to future Branch responses to an employee's suicide, which angered Wilcox and he responded by openly admonishing and belittling Plaintiff in front of Ballard for her alleged behavior at the funeral and accused Plaintiff of casting the Branch in a bad light.

82. On or about May 25, 2016, Plaintiff met with Wilcox privately to discuss his public disparagement of her in front of Ballard with false accusations about her behavior at a funeral for a colleague.

83. Wilcox was unable to articulate what the behavior was that inappropriate and later in the meeting recalled that he had heard Plaintiff was "very emotional" at the funeral, which was also untrue and Plaintiff remained calm throughout.

84. Following Plaintiff's coworker's suicide and the funeral, she became actively involved in raising awareness about mental illness at work and an ardent advocate for employees with mental health issues.

85. Plaintiff volunteered to assist Ted Mason, Fire Safety Specialist, in developing a suicide education program for the Agency, which Plaintiff's supervisors had knowledge of because her role involved numerous meetings and draft proposals submitted to Branch management for review.

86. Plaintiff was humiliated by Wilcox's accusations which were easily disproved and the intentional and malicious nature of Wilcox's accusations, i.e. Plaintiff acting disrespectful while attending a funeral of a colleague who took his own life, with knowledge of Plaintiff's own mental disability caused Plaintiff significant emotional distress, embarrassment, shame,

hopelessness, and deeply and personally offended her.

*2016 – Berry Fire Assignment, Performance Rating, Denial of Transfer*

87. In or around August 20, 2016, Plaintiff was placed on an emergency fire assignment referred to as the Berry Fire.

88. Tim Roide, Berry Fire Incident Commander, was the individual overseeing the assignment and had worked closely with Wilcox, whom Roide considered as a mentor.

89. Ben Brack was Plaintiff's direct supervisor on the fire and he advised her that she would be demobilized on September 1, 2016 and available for reassignment.

90. On August 30, 2016, Plaintiff spoke with Jessica Bender, Brack's supervisor, who advised Plaintiff that was not the information that had been provided to her, implying that Plaintiff had been removed from the assignment for reasons other than her role was no longer needed.

91. Bender had knowledge of Plaintiff's disability because Plaintiff requested reasonable accommodations (quiet sleeping area) that were initially granted by Brack; however, Bender reversed his decision, and described Plaintiff's requests disdainfully as "selfish and demanding."

92. On August 31, 2016, Plaintiff was demobilized and left to return home when she received a call from dispatch with a new assignment to report to the Pioneer Fire because Plaintiff had 5-days remaining for her fire assignment.

93. Shortly after the call, Plaintiff emailed Eaton and advised him that she had been reassigned to the Pioneer Fire.

94. In or around November 2016, Eaton gave Plaintiff a Level 3 rating (out of 5) for "Customer Service" which was one of the four Critical Elements of her FY2016 Employee Performance Appraisal Process.

95. Plaintiff was shocked by her lowered rating because Plaintiff had always received a rating higher than 3 for Customer Service and had not had any performance issues or concerns for that rating period.

96. Eaton told Plaintiff that her lowered rating was the result of her behavior at the funeral, Plaintiff's combative nature after the funeral, and Eaton stated that Wilcox requested that Plaintiff's rating be lowered.

97. Eaton told Plaintiff that she was prohibited from communicating with Wilcox about her rating, even though Wilcox was her second-line supervisor, provided input for her ratings, and Wilcox had requested the Level 3 rating.

98. Plaintiff never engaged in any behavior at the funeral that was inappropriate or would warrant any lowered rating or discipline.

99. Plaintiff never exhibited a combative nature after her return to the funeral – the only actions Plaintiff took after her return from the funeral were: (1) she suggested a new protocol for Branch responses to employee suicides; (2) she asked to meet with Wilcox after he humiliated her in front of Ballard with false accusations of inappropriate behavior but Wilcox only recalled hearing Plaintiff was "very emotional" at the funeral (which was untrue); and (3) Plaintiff was actively involved in development of the Agency's suicide prevention and mental illness awareness programs.

100. With Eaton's new threats prohibiting Plaintiff's communications with her second-line supervisor, Wilcox – Plaintiff was left with no alternative other than to seek assistance from a higher supervisor.

101. On or about December 8, 2016, Plaintiff verbally complained to Rupert, Division Chief, about Wilcox, Eaton, she reported that she had been placed in an isolated office away from

all Branch staff, she was not given any meaningful work assignments, she was the only one treated this way, and she requested a reassignment.

*2017 – Harassment Complaints, Suspension, Performance Rating, Denials of Office, Detail*

102. On January 3, 2017, Plaintiff followed-up with a phone call to Rupert but he never returned her call or responded to her complaints.

103. Coincidentally, on January 3, 2017, Eaton issued Plaintiff a Proposed 10-Day Suspension dated December 26, 2016 for alleged Failure to Follow Supervisory Instructions.

104. The Proposal contained serious allegations against Plaintiff that had never been raised with her and implicated her job performance, professionalism, work ethic, and attacked her on a personal level related to the Berry Fire assignment.

105. Eaton accused Plaintiff of engaging in intentional behaviors that were allegedly disruptive, insubordinate, and purportedly posed a risk to firefighter safety.

106. Eaton never told Plaintiff that there were concerns about her conduct at the Berry Fire, he never advised her of any reports/complaints about her actions, and he never interviewed her or asked Plaintiff any questions about the allegations against her, which she first became aware of when she received the Proposal.

107. Additionally, Eaton did not address any concerns with the Plaintiff about the allegations during her FY2016 performance review, yet the allegations in the Proposal related to the Plaintiff's performance during a fire assignment from August 2016.

108. On January 3, 2017, Plaintiff again met with Wilcox and requested to move to an empty office in the main suite because one had remained empty for over a year and he had approved Tongier's request in 2016.

109. Wilcox stated he would review Plaintiff's request with Eaton and let her know but he never

did.

110. On January 10, 2017, Plaintiff submitted her Reply to the Proposed Suspension which alleged that the Proposal had been issued in unlawful retaliation based on Plaintiff's protected activities.

111. Also, on January 10, 2017, Wilcox announced that the last remaining empty office in the main suite would be occupied by Leslie Neu, a newly hired volunteer.

112. Several weeks later, Neu vacated that office and it remained vacant, despite Plaintiff's repeated requests for an office in the main suite as a reasonable accommodation and to enable her to perform her job duties.

113. In or around September 2017, Tate Fisher (male, no disability, no prior EEO activity) was assigned a vacant office with a window in the main suite.

114. From 2015 through 2017, empty offices remained in the Jack Wilson building that would have accommodated Plaintiff's depression and enabled her to perform her job duties with the other Branch staff.

115. On February 17, 2017, Plaintiff initiated EEO contact and requested informal counseling.

116. On March 23, 2017, Plaintiff requested an office in the main suite from Eaton during her mid-year performance review.

117. On April 7, 2017, Plaintiff filed her formal EEO complaint.

118. On April 12, 2017, Wilcox issued his Decision on the Proposed Suspension sustaining the charge with a mitigation to 5-days suspension based on Plaintiff's previous work performance and witness statements that corroborated job tensions and personality conflicts.

119. On April 14, 2017, Plaintiff met with Wilcox because she had several questions about his

April 12, 2017 Decision.

120. The only explanation Wilcox provided for sustaining the suspension was based on what he claimed Roide stated about Plaintiff as being "insubordinate" when she agreed to take the reassignment and then Wilcox proceeding to intimidate Plaintiff with loaded questions inquiring whether Plaintiff should be permitted to continue serving on fire teams since Wilcox was "concerned" with Plaintiff's abilities to "adapt to changing direction," which was a threat because he could deny her fire qualification card.

121. Wilcox added that he had not advised anyone to deny Plaintiff's card *yet*.

122. Significantly, Wilcox's explanation for Plaintiff's suspension was illogical because it was not one of the allegations or charges against her.

123. The Proposed Suspension and Decision were not based on legitimate reasons and undermined by the fact that none of the allegations were raised in Plaintiff's performance meetings, never Wilcox

124. In July 2017, Rich Johnston, Chief of the FWS Division of Refuge Law Enforcement invited Plaintiff to work on a 1 to 2-month detail assignment where Plaintiff would assist with critical and emerging national strategic communications needs which would be valuable experience to further her career opportunities but Eaton accused Plaintiff of improperly communicating with Chief Johnston and that he too had improperly communicated with Plaintiff without contacting Eaton first.

125. Eaton advised Plaintiff that if she accepted the detail that she was required to be available for any work at any time at the Fire Branch and she was require to submit an outline to Eaton with all of the work and expectations of the detail in advance, and Plaintiff would be required to pay all expenses for returning home because the detail was for Plaintiff's

17

"personal benefit."

126. Eaton's unnecessary restrictions and requirements in an attempt to thwart Plaintiff's detail opportunity were accepted but Plaintiff's supervisors continued to delay approval of the detail, which was never approved.

127. Later, Eaton told Plaintiff that she was being reassigned to another detail with the Hunting and Fishing Initiative Team which also never occurred.

128. All of the individuals in Plaintiff's supervisory chain were aware of her sex (female), disability, and prior EEO activity.

129. Since 2012, Plaintiff has made repeated requests for supervisory training and she has only been approved for one class of the transitioning to a supervisory role.

130. Plaintiff's coworker, Gillian Fay (no disability, no prior EEO activity), Budget Officer, GS-13, who is in the same supervisory chain of command as Plaintiff, has taken supervisory trainings and advanced supervisory trainings approved by Eaton.

131. From 2016 to 2018, Plaintiff has not been approved for any trainings beyond the mandatory trainings required.

132. Plaintiff's supervisors regularly made comments alleging that she was "emotional" or "intimidating" and "unable to work with others" implying that Plaintiff was a "safety risk" which were not true and merely derogatory insults that called into question her mental stability based on her mental disability.

133. Defendant's refusal to permit Plaintiff to go on details that would provide her with supervisory experience and career advancement opportunities because she was required to be available at any time to perform work for her Branch undermined by the fact that Plaintiff had not been permitted to work with NIFC EA, public affairs group for years and

18

she had been isolated away from all Branch staff and not given any meaningful assignments despite requests.

134. Defendant's actions were based on Plaintiff's disability, sex, and protected activities and culminated in regular harassment that was severe, pervasive, and negatively impacted her ability to perform her job duties, caused her to lose valuable career advancement opportunities, and resulted in exacerbating her anxiety and depression.

135. During the relevant time period, Plaintiff was the only staff member with a mental disability and one of the five female staff members out of 15 total staff in the Fire Management Branch.

136. Plaintiff's male coworkers were not accused of being "irrational" or "too emotional" and were not subjected to the same scrutiny and hostility as she was.

137. Management treated Plaintiff's similarly-situated coworkers outside her protected classes more favorably and did not subject them to the same hostility and harassment.

<u>COUNT 1</u>

138. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

139. By and through its conduct, Defendant subjected Plaintiff to unlawful discrimination based on her sex (female) in violation of Title VII of the Civil Rights Act of 1964.

140. Plaintiff has sustained damages consisting of emotional distress, pain and suffering, lost wages, and her losses are continuing.

<u>COUNT 2</u>

141. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

142. By and through its conduct, Defendant subjected Plaintiff to an unlawful hostile work environment based on her sex in violation of Title VII of the Civil Rights Act of 1964.

143. Plaintiff has sustained damages consisting of emotional distress, pain and suffering, lost wages, and her losses are continuing.

COUNT 3

144. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

145. By and through their conduct, Defendant subjected Plaintiff to unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964.

146. Plaintiff has sustained damages consisting of emotional distress, pain and suffering, lost wages, and her losses are continuing.

COUNT 4

147. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

148. By and through their conduct, Defendant subjected Plaintiff to unlawful retaliatory hostile work environment in violation of Title VII of the Civil Rights Act of 1964.

149. Plaintiff has sustained damages consisting of emotional distress, pain and suffering, lost wages, and her losses are continuing.

COUNT 5

150. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

151. By and through its conduct, Defendant subjected Plaintiff to unlawful discrimination based on her disabilities in violation of Section 501 of the Rehabilitation Act of 1973.

152. Plaintiff has sustained damages consisting of emotional distress, pain and suffering, lost wages, and her losses are continuing.

COUNT 6

153. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

154. By and through its conduct, Defendant subjected Plaintiff to an unlawful hostile work environment based on her disabilities in violation of Section 501 of the Rehabilitation Act of 1973.

155. Plaintiff has sustained damages consisting of emotional distress, pain and suffering, lost wages, and her losses are continuing.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts contained in the Complaint.

WHEREFORE, Plaintiff respectfully requests this Court enter judgment against the Defendant on all Counts and award Plaintiff lost wages and benefits, compensatory damages in the amount of $300,000, or in an amount to be determined at trial, for pain and suffering and emotional distress, pre- and post-judgment interest, costs, attorneys' fees, and any such other relief as is just and proper.

Date:   June 13, 2020

RESPECTFULLY SUBMITTED,

Alan Lescht & Associates, P.C.

By: /s/_____
Rani Rolston [Bar # 974052]
ALAN LESCHT & ASSOCIATES, P.C.
1825 K Street, N.W., Suite 750
Washington, D.C. 20006
Tel: (202) 463-6036
Fax: (202) 463-6067
rani.rolston@leschtlaw.com
*Attorney for Plaintiff*